ANDERSON, CLAYTON & CO.

v.

UNITED STATES.

No. 343-55.

United States Court of Claims.

Dec. 4, 1957.

John C. White, Houston, Tex., for plaintiff. Fulbright, Crooker, Freeman, Bates & White, Houston, Tex., were on the briefs.

John A. Rees, Washington, D. C., with whom was Asst. Atty. Gen. Charles K. Rice, for defendant. James P. Garland, Washington, D. C., was on the brief.

LITTLETON, Judge.

Plaintiff sues to recover $39,507.93, representing an alleged overpayment of excess profits taxes and interest for the fiscal years ending July 31, 1950 and July 31, 1951, together with interest thereon as provided by law from the date of payment, March 9, 1955. Timely claims for refund were rejected by the Commissioner of Internal Revenue on August 23, 1955.

Plaintiff, a Delaware corporation with its principal place of business in Houston, Texas, is engaged in the merchandising and ginning of cotton, the crushing of cottonseed, the refining of cottonseed oil, and other related activities. During its fiscal year ended July 31, 1951, and for many years prior thereto, plaintiff owned all the capital stock of Western Cottonoil Company, a Delaware corporation engaged in the ginning of cotton, crushing of cottonseed, refining of cottonseed oil, and other related activities in the states of Texas, Oklahoma, New Mexico, Arizona and California.

In order to centralize working capital, the plaintiff followed a general policy of financing its subsidiaries, including Western Cottonoil Company, by capitalizing them in an amount equal to their fixed investments and furnishing to them working capital in the form loans on notes and current advances on open account. Because its cotton collateral was quick and marketable, plaintiff, a cotton merchandising firm, could borrow money at rates of from 2 to 2½ percent below those available to its subsidiary cottonoil companies whose assets were less available as collateral.

By reason of the expansion of cotton growing in new irrigated areas, new gins were required, and because of the adoption of a new and more efficient solvent process for extracting cottonseed oil, large new fixed asset investments were made by plaintiff's subsidiary, Western. By the spring of 1951 Western's fixed assets account had increased to approximately $30,000,000, whereas its outstanding capital stock was only about $1,693,000. It was thus apparent to the plaintiff, the parent corporation, that its subsidiary was seriously undercapitalized.

. After exploring and abandoning as impracticable, an attempt to have the

subsidiary raise capital through the issuance of bonds or through direct bank borrowings, the management of the plaintiff corporation decided to propose to its board of directors that the subsidiary be dissolved and its operations conducted as a division of the parent company. At that time the subsidiary was indebted to the plaintiff in the sum of $51,-062,500.16, evidenced by promissory notes, and an indebtedness on advances on open account in the sum of $1,689,-028.47.

In studying this matter the plaintiff corporation concluded that prior to the adoption of any plan of liquidation of the subsidiary, the total indebtedness of $52,-751,528.63 of the subsidiary to the parent company should be eliminated either by repayment to the parent, or by the cancellation thereof as a contribution by plaintiff to capital of the subsidiary. In this connection plaintiff had in mind the avoidance of recognition of taxable gain to either company upon the liquidation of the subsidiary.

Following an unsuccessful attempt by the subsidiary to borrow a sufficient amount from banks to pay off the above indebtedness to the parent company, the management of the plaintiff company decided to recommend to the board of directors of plaintiff that it cancel the entire indebtedness as a contribution to the capital of the subsidiary. At a meeting of the parent's board on July 2, 1951, the parent company was duly authorized to make a contribution of the indebtedness to the capital of the subsidiary, and on July 10, 1951, the parent company canceled and returned to the subsidiary its notes and also canceled the above mentioned indebtedness on open account. The total amount of $52,751,528.63 was thereupon entered on the books of both companies as a contribution to the capital of the subsidiary. In determining to contribute this amount to the capital of the subsidiary, no consideration was given to the effect of such capital contribution upon excess profits credit of the subsidiary, and it was not a factor in the decision.

On July 31, 1951, the subsidiary, Western Cottonoil Company was merged into plaintiff, and thereafter the business operation and activities of the subsidiary were carried on and substantially expanded by plaintiff, the parent corporation.

For the purpose of determining the excess profits credit of the subsidiary, Western Cottonoil Company, for the fiscal year ended July 31, 1951, the Commissioner of Internal Revenue determined that the indebtedness to the parent company of $51,062,500.16, evidenced by notes, was properly included in borrowed capital for the purpose of computing the excess profits credit prior to the cancellation of the notes on July 10, 1951, but that the $52,751,528.63 contribution to the capital of Western made on July 10, 1951, was not a capital contribution for the purpose of calculating the excess profits credit after July 10. Thus, the excess profits credit of Western was reduced for the fiscal year ending July 31, 1951, by the sum of $364,202.34, representing 12 percent of 21/365th of $52,-751,528.63. This action also eliminated a carryback from 1951 to 1950, and the Commissioner determined and assessed an additional excess profits tax of $7,-939.61 for the fiscal year ending July 31, 1950, of which sum $7,079.79 was attributable to the elimination of such excess profits credit carryback. By reason of the elimination of $364,202.34 from the excess profits credit of Western Cottonoil Company for 1951, the Commissioner also assessed an additional excess profits tax of $25,902.03 for 1951. Plaintiff, as successor to Western, paid these assessments with interest thereon of $6,526.11 on March 9, 1955.

Section 435 of the Internal Revenue Code (26 U.S.C. [1952 ed.] § 435) provides that the excess profits credit for any taxable year shall be the sum of (1) 83 percent of the average base period net income, and (2) 12 percent of the net capital addition for the capital year, minus 12 percent of the net capital reduction for the taxable year. Section 435 (g) of the Internal Revenue Code, 26 U.

S.C.A. Excess Profits Taxes, § 435, defines net capital addition as follows:

"(1) *Net capital addition.*

"The net capital addition for the taxable year shall, for the purposes of this section, be the excess, divided by the number of days in the taxable year, of the aggregate of the daily capital addition for each day of the taxable year over the aggregate of the daily capital reduction for each day of the taxable year. \* \* \*

\* \* \* \* \* \*

"(3) *Daily capital addition.*

"The daily capital addition for any day of the taxable year shall, for the purposes of this section, be the sum of the following:

"(A) The aggregate of the amounts of money and property paid in for stock, or as paid-in surplus, or as a contribution to capital, after the beginning of the taxable year and prior to such day.

"(B) The amount, if any, by which the equity capital (as defined in section 437(c)) at the beginning of the taxable year exceeds the equity capital at the beginning of the taxpayer's first taxable year under this subchapter.

"(C) 75 per centum of the amount, if any, by which the average borrowed capital for the taxable year (as defined in section 439(a)) exceeds the daily borrowed capital for the first day of the taxpayer's first taxable year under this subchapter."

Section 441 of the Code contains the rules for determining excess profits credit as follows:

"(a) *Equity capital.*

"The term 'equity capital' means the equity capital as defined in section 437(c).

"(b) *Property paid-in.*

"For the purpose of determining the amount of property paid in for stock, or as paid-in surplus, or as a contribution to capital, such property shall be included in an amount equal to its basis (unadjusted) for determining gain upon sale or exchange. If the unadjusted basis of the property is a substituted basis, such basis shall be adjusted, with respect to the period before the property was paid in, by an amount equal to the adjustments proper under section 113(b) (2).

"(c) *Money and property paid-in.*

"For the purpose of determining the amount of money and property paid in for stock, or as paid-in surplus, or as a contribution to capital, there shall be included *only money and property paid in good faith for the purposes of the taxpayer's business.*

\* \* \* \* \* \*

"(g) \* \* \* (2) *If an indebtedness of the taxpayer is canceled or released* in exchange for stock, or *as paid-in surplus, or as a contribution to capital,* the *amount paid in shall be considered equal to the amount of the indebtedness.*" [Italics supplied.]

The question presented for decision is whether the contribution to the capital of its subsidiary by plaintiff through the cancellation of the subsidiary's indebtedness (notes and current account), constituted money and property paid in good faith for the purpose of the subsidiary's business and therefore became a proper basis for computing the subsidiary's invested capital credit?

The defendant concedes that the loans by the plaintiff to its subsidiary were made in good faith for the purpose of the subsidiary's business, being part of a plan whereby the parent company could furnish working capital to the subsidiary more cheaply than the subsidiary could obtain funds elsewhere. It is also conceded that if the cancellation of the subsidiary's indebtedness to the parent had been made to furnish additional *working* capital, then there would be no defense to plaintiff's claim.

There is no dispute concerning the good faith of the cancellation of indebtedness here involved. We think it is important to note that in this case the cancellation of the indebtedness and the transfer and conversion of the indebtedness to equity capital did not reduce the working capital of the subsidiary for the remainder of the fiscal year 1951. The funds belonged to Western for that period and were continued in use of the business of the subsidiary from July 11 to July 31, 1951, when the subsidiary was merged with the parent company and its business was thereafter carried on and substantially expanded by the parent company.

Despite the above concessions, defendant makes the contention, which in our opinion is untenable, that the cancellation of the indebtedness was not intended to serve any purpose of the subsidiary's business; that the subsidiary already had the money and property of the parent corporation that had been previously loaned to it for the purposes of its business, and that the sole purpose of the cancellation of the loans and the open account was to avoid the recognition of gain to either company following a later dissolution of the subsidiary corporation. Such a contention finds no support either in the facts of this case or in the applicable law or regulations. Both section 441(g) (2), quoted above, and Regulations 130, section 437–6(3), provide that if an indebtedness of the taxpayer is canceled or released as a contribution to capital, the amount paid in shall be considered equal to the amount of the indebtedness.

In view of the obvious undercapitalization of the subsidiary discussed above, and the continued need in the business for the funds represented by the notes and open account of indebtedness to the parent company, the cancellation of the notes and the account balance clearly amounted under the statute to a good faith contribution to capital to be included in computing the daily capital additions on which the excess profits credit for any taxable year is to be computed.

The defendant was in error in treating the transaction otherwise.

Plaintiff is entitled to recover $39,507.93 with interest thereon from March 9, 1955, according to law, and judgment will be entered to that effect.

It is so ordered.

MARIS, Circuit Judge (sitting by designation), JONES, Chief Judge, and MADDEN and WHITAKER, Judges, concur.